(Slip Opinion)          OCTOBER TERM, 2011          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## REHBERG *v*. PAULK

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE ELEVENTH CIRCUIT

No. 10–788.   Argued November 1, 2011—Decided April 2, 2012

Respondent, the chief investigator for a district attorney's office, testi-
fied at grand jury proceedings that resulted in petitioner's indict-
ment.  After the indictments were dismissed, petitioner brought an
action under 42 U. S. C. §1983, alleging that respondent had con-
spired to present and did present false testimony to the grand jury.
The Federal District Court denied respondent's motion to dismiss on
immunity grounds, but the Eleventh Circuit reversed, holding that
respondent had absolute immunity from a §1983 claim based on his
grand jury testimony.

*Held:* A witness in a grand jury proceeding is entitled to the same abso-
lute immunity from suit under §1983 as a witness who testifies at
trial.  Pp. 3–18.

(a) Section 1983, which derives from §1 of the Civil Rights Act of
1871, was not meant to effect a radical departure from ordinary tort
law and the common-law immunities applicable in tort suits.  See,
*e.g.*, *Burns* v. *Reed*, 500 U. S. 478, 484.  This interpretation of §1983
has been reaffirmed by the Court time and again.  Thus, the Court
looks to the common law for guidance in determining the scope of the
immunities available in actions brought under §1983.  See *Kalina* v.
*Fletcher*, 522 U. S. 118, 123.  Taking a "functional approach," see,
*e.g., Forrester* v. *White*, 484 U. S. 219, 224, the Court identifies those
governmental functions that were historically viewed as so important
and vulnerable to interference by means of litigation that some form
of absolute immunity from civil liability was needed to ensure that
they are "'performed with independence and without fear of conse-
quences,'" *Pierson* v. *Ray*, 386 U. S. 547, 554.

The Court's functional approach is tied to the common law's identi-
fication of functions meriting the protection of absolute immunity,

but the Court's precedents have not mechanically duplicated the precise scope of the absolute immunity the common law provided to protect those functions.  For example, it was common in 1871 for cases to be prosecuted by private parties, who did not enjoy absolute immunity from suit.  But as the prosecutorial function was increasingly assumed by public officials, common-law courts held that public prosecutors, unlike their private predecessors, were absolutely immune from the types of tort claims that an aggrieved or vengeful criminal defendant was most likely to assert.  This adaptation of prosecutorial immunity accommodated the special needs of public, as opposed to private, prosecutors.  Thus, when the issue of prosecutorial immunity under §1983 reached this Court in *Imbler* v. *Pachtman*, 424 U. S. 409, the Court did not simply apply the scope of immunity recognized by common-law courts as of 1871 but instead relied substantially on post-1871 cases extending broad immunity to public prosecutors sued for common-law torts.  Neither has the Court suggested that §1983 is simply a federalized amalgamation of pre-existing common-law claims.  The new federal claim created by §1983 differs in important ways from pre-existing common-law torts.  Accordingly, both the scope of the new tort and the scope of the absolute immunity available in §1983 actions differ in some respects from the common law. Pp. 3—9.

   (b) A trial witness sued under §1983 enjoys absolute immunity from any claim based on his testimony.  *Briscoe* v. *LaHue*, 460 U. S. 352.  Without absolute immunity, the truth-seeking process would be impaired as witnesses might be reluctant to testify, and even a witness who took the stand "might be inclined to shade his testimony in favor of the potential plaintiff" for "fear of subsequent liability."  *Id*., at 333.  These factors apply with equal force to grand jury witnesses. In both contexts, a witness' fear of retaliatory litigation may deprive the tribunal of critical evidence.  And in neither context is the deterrent of potential civil liability needed to prevent false testimony because other sanctions, chiefly prosecution for perjury, provide a sufficient deterrent.

   For the reasons identified in *Briscoe, supra,* at 342–344, there is no reason to distinguish law enforcement witnesses from lay witnesses in §1983 actions.  And the rule that a grand jury witness has absolute immunity from any §1983 claim based on the witness' testimony may not be circumvented by claiming that a grand jury witness conspired to present false testimony, or by using evidence of the witness' testimony to support any other §1983 claim concerning the initiation or maintenance of a prosecution.  Were it otherwise, a criminal defendant turned civil plaintiff could reframe a claim to attack the preparatory activity—such as a preliminary discussion in which the witness

relates the substance of his intended testimony—rather than the absolutely immune actions themselves. Pp. 9−12.

  (c) Petitioner's main argument is that under *Malley* v. *Briggs,* 475 U. S. 335, 340−341, and *Kalina* v. *Fletcher,* 522 U. S. 118, 131, grand jury witnesses who are "complaining witnesses" are not entitled to absolute immunity. But at the time §1983's predecessor was enacted, a "complaining witness" was a party who procured an arrest and initiated a criminal prosecution. A "complaining witness" *might* testify, either before a grand jury or at trial, but testifying was not a necessary characteristic of a "complaining witness." Thus, testifying, whether before a grand jury or at trial, was not the distinctive function performed by a "complaining witness." A "complaining witness" cannot be held liable for perjurious *trial* testimony, see *Briscoe*, 460 U. S., at 326, and there is no more reason why a "complaining witness" should be subject to liability for testimony before a grand jury.

  Once the distinctive function performed by a "complaining witness" is understood, it is apparent that a law enforcement officer who testifies before a grand jury is not comparable to a "complaining witness" because it is not the officer who makes the critical decision to press criminal charges, but the prosecutor. It would be anomalous to permit a police officer testifying before a grand jury to be sued for maliciously procuring an unjust prosecution when it is the prosecutor, who is shielded by absolute immunity, who is actually responsible for the decision to initiate a prosecution. Petitioner also contends that the deterrent effect of civil liability is more needed in grand jury proceedings because trial witnesses face cross-examination. But the force of that argument is more than offset by the problem that allowing such civil actions would create—subversion of grand jury secrecy, which is essential to the proper functioning of the grand jury system. See *United States* v. *Sells Engineering, Inc.,* 463 U. S. 418, 424. And finally, contrary to petitioner's suggestion, recognizing absolute immunity for grand jury witnesses does not create an insupportable distinction between States that use grand juries and States that permit felony prosecutions to be brought by complaint or information. Most States that do not require an indictment for felonies provide a preliminary hearing at which witnesses testify, and the lower courts have held that preliminary hearing witnesses are protected by the same immunity accorded grand jury witnesses. Pp. 12−18.

611 F. 3d 828, affirmed.

  ALITO, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 10–788

———————

## CHARLES A. REHBERG, PETITIONER *v.* JAMES P. PAULK

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[April 2, 2012]

JUSTICE ALITO delivered the opinion of the Court.

This case requires us to decide whether a "complaining witness" in a grand jury proceeding is entitled to the same immunity in an action under 42 U. S. C. §1983 as a witness who testifies at trial. We see no sound reason to draw a distinction for this purpose between grand jury and trial witnesses.

## I

Petitioner Charles Rehberg, a certified public accountant, sent anonymous faxes to several recipients, including the management of a hospital in Albany, Georgia, criticizing the hospital's management and activities. In response, the local district attorney's office, with the assistance of its chief investigator, respondent James Paulk, launched a criminal investigation of petitioner, allegedly as a favor to the hospital's leadership.

Respondent testified before a grand jury, and petitioner was then indicted for aggravated assault, burglary, and six counts of making harassing telephone calls. The indictment charged that petitioner had assaulted a hospital physician, Dr. James Hotz, after unlawfully entering the

doctor's home. Petitioner challenged the sufficiency of the indictment, and it was dismissed.

A few months later, respondent returned to the grand jury, and petitioner was indicted again, this time for assaulting Dr. Hotz on August 22, 2004, and for making harassing phone calls. On this occasion, both the doctor and respondent testified. Petitioner challenged the sufficiency of this second indictment, claiming that he was "nowhere near Dr. Hotz" on the date in question and that "[t]here was no evidence whatsoever that [he] committed an assault on anybody." 611 F. 3d 828, 836 (CA11 2010). Again, the indictment was dismissed.

While the second indictment was still pending, respondent appeared before a grand jury for a third time, and yet another indictment was returned. Petitioner was charged with assault and making harassing phone calls. This final indictment was ultimately dismissed as well.

Petitioner then brought this action against respondent under Rev. Stat. §1979, 42 U. S. C. §1983. Petitioner alleged that respondent conspired to present and did present false testimony to the grand jury. Respondent moved to dismiss, arguing, among other things, that he was entitled to absolute immunity for his grand jury testimony. The United States District Court for the Middle District of Georgia denied respondent's motion to dismiss, but the Court of Appeals reversed, holding, in accordance with Circuit precedent, that respondent was absolutely immune from a §1983 claim based on his grand jury testimony.

The Court of Appeals noted petitioner's allegation that respondent was the sole "complaining witness" before the grand jury, but the Court of Appeals declined to recognize a "complaining witness" exception to its precedent on grand jury witness immunity. See 611 F. 3d, at 839–840. "[A]llowing civil suits for false grand jury testimony," the court reasoned, "would . . . emasculate the confidential

nature of grand jury testimony, and eviscerate the traditional absolute immunity for witness testimony in judicial proceedings." *Id.,* at 840. The court went on to hold that respondent was entitled to absolute immunity, not only with respect to claims based directly on his grand jury testimony, but also with respect to the claim that he conspired to present such testimony. *Id.,* at 841. To allow liability to be predicated on the alleged conspiracy, the court concluded, "'would be to permit through the back door what is prohibited through the front.'" *Ibid.* (quoting *Jones* v. *Cannon,* 174 F. 3d 1271, 1289 (CA11 1999)).

We granted certiorari to resolve a Circuit conflict regarding the immunity of a "complaining witness" in a grand jury proceeding, 562 U. S. \_\_\_ (2011), and we now affirm.

## II

Section 1983, which derives from §1 of the Civil Rights Act of 1871, 17 Stat. 13, creates a private right of action to vindicate violations of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Under the terms of the statute, "'[e]very person' who acts under color of state law to deprive another of a constitutional right [is] answerable to that person in a suit for damages." *Imbler* v. *Pachtman,* 424 U. S. 409, 417 (1976) (citing 42 U. S. C. §1983).

## A

Despite the broad terms of §1983, this Court has long recognized that the statute was not meant to effect a radical departure from ordinary tort law and the common-law immunities applicable in tort suits. See, *e.g., Burns* v. *Reed,* 500 U. S. 478, 484 (1991). More than 60 years ago, in *Tenney* v. *Brandhove,* 341 U. S. 367 (1951), the Court held that §1983 did not abrogate the long-established absolute immunity enjoyed by legislators for actions taken

within the legitimate sphere of legislative authority. Immunities "well grounded in history and reason," the Court wrote, were not somehow eliminated "by covert inclusion in the general language" of §1983. *Id.,* at 376.

This interpretation has been reaffirmed by the Court time and again and is now an entrenched feature of our §1983 jurisprudence. See, *e.g.*, *Pierson* v. *Ray*, 386 U. S. 547, 554–555 (1967) ("The legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities. Accordingly, this Court held . . . that the immunity of legislators for acts within the legislative role was not abolished. The immunity of judges for acts within the judicial role is equally well established, and we presume that Congress would have specifically so provided had it wished to abolish the doctrine"); *Imbler*, *supra,* at 418 (statute must "be read in harmony with general principles of tort immunities and defenses rather than in derogation of them"); *Procunier* v. *Navarette*, 434 U. S. 555, 561 (1978) ("Although the Court has recognized that in enacting §1983 Congress must have intended to expose state officials to damages liability in some circumstances, the section has been consistently construed as not intending wholesale revocation of the common-law immunity afforded government officials"); *Briscoe* v. *LaHue*, 460 U. S. 325, 330 (1983) ("'It is by now well settled that the tort liability created by §1983 cannot be understood in a historical vacuum. . . . One important assumption underlying the Court's decisions in this area is that members of the 42d Congress were familiar with common-law principles, including defenses previously recognized in ordinary tort litigation, and that they likely intended these common-law principles to obtain, absent specific provisions to the contrary'" (quoting *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 258 (1981)); *Pulliam* v. *Allen*, 466 U. S. 522, 529 (1984) ("The starting point in our own analysis is the common law. Our cases have proceeded on the assump-

tion that common-law principles of . . . immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so").

## B

Recognizing that "Congress intended [§1983] to be construed in the light of common-law principles," the Court has looked to the common law for guidance in determining the scope of the immunities available in a §1983 action. *Kalina* v. *Fletcher*, 522 U. S. 118, 123 (1997). We do not simply make our own judgment about the need for immunity. We have made it clear that it is not our role "to make a freewheeling policy choice," *Malley* v. *Briggs*, 475 U. S. 335, 342 (1986), and that we do not have a license to create immunities based solely on our view of sound policy, see *Tower* v. *Glover*, 467 U. S. 914, 922–923 (1984). Instead, we conduct "a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." *Imbler, supra,* at 421.

We take what has been termed a "functional approach." See *Forrester* v. *White*, 484 U. S. 219, 224 (1988); *Burns, supra,* at 486. We consult the common law to identify those governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed to ensure that they are performed "'with independence and without fear of consequences.'" *Pierson, supra,* at 554 (quoting *Bradley* v. *Fisher*, 13 Wall. 335, 350, n. ‡ (1872)). Taking this approach, we have identified the following functions that are absolutely immune from liability for damages under §1983: actions taken by legislators within the legitimate scope of legislative authority, see *Tenney, supra*; actions taken by judges within the legitimate scope of judicial authority, see *Pierson, supra*; actions taken by prosecutors in their role as advocates, see *Imbler*, 424 U. S., at 430–

431; and the giving of testimony by witnesses at trial, see *Briscoe, supra*. By contrast, the Court has found no absolute immunity for the acts of the chief executive officer of a State, the senior and subordinate officers of a State's National Guard, the president of a state university, see *Scheuer* v. *Rhodes*, 416 U. S. 232, 247–248 (1974); school board members, see *Wood* v. *Strickland*, 420 U. S. 308, 318 (1975); the superintendent of a state hospital, see *O'Connor* v. *Donaldson*, 422 U. S. 563, 577 (1975); police officers, see *Pierson, supra,* at 555; prison officials and officers, *Procunier, supra,* at 561; and private co-conspirators of a judge, see *Dennis* v. *Sparks*, 449 U. S. 24, 27 (1980).

C

While the Court's functional approach is tied to the common law's identification of the functions that merit the protection of absolute immunity, the Court's precedents have not mechanically duplicated the precise scope of the absolute immunity that the common law provided to protect those functions. See, *e.g.*, *Burns*, 500 U. S*.,* at 493 ("'[T]he precise contours of official immunity' need not mirror the immunity at common law" (quoting *Anderson* v. *Creighton,* 483 U. S. 635, 645 (1987))).

This approach is illustrated by the Court's analysis of the absolute immunity enjoyed today by public prosecutors. When §1983's predecessor was enacted in 1871, it was common for criminal cases to be prosecuted by private parties. See, *e.g.*, *Stewart* v. *Sonneborn*, 98 U. S. 187, 198 (1879) (Bradley, J., dissenting) ("[E]very man in the community, if he has probable cause for prosecuting another, has a perfect right, by law, to institute such prosecution, subject only, in the case of private prosecutions, to the penalty of paying the costs if he fails in his suit"). And private prosecutors, like private plaintiffs in civil suits, did not enjoy absolute immunity from suit. See *Malley*, 475

U. S., at 340–341, and n. 3 (citing cases). Instead, "the generally accepted rule" was that a private complainant who procured an arrest or prosecution could be held liable in an action for malicious prosecution if the complainant acted with malice and without probable cause. See *id.*, at 340–341; see also *Briscoe*, 460 U. S., at 351 (Marshall, J., dissenting) ("Both English and American courts routinely permitted plaintiffs to bring actions alleging that the defendant had made a false and malicious accusation of a felony to a magistrate or other judicial officer"); *Wheeler* v. *Nesbitt*, 24 How. 544, 550 (1861) ("Undoubtedly, every person who puts the criminal law in force maliciously, and without any reasonable or probable cause, commits a wrongful act; and if the accused is thereby prejudiced, either in his person or property, the injury and loss so sustained constitute the proper foundation of an action to recover compensation"); *Dinsman* v. *Wilkes*, 12 How. 390, 402 (1852) (no immunity "where a party had maliciously, and without probable cause, procured the plaintiff to be indicted or arrested for an offence of which he was not guilty").

In the decades after the adoption of the 1871 Civil Rights Act, however, the prosecutorial function was increasingly assumed by public officials, and common-law courts held that public prosecutors, unlike their private predecessors, were absolutely immune from the types of tort claims that an aggrieved or vengeful criminal defendant was most likely to assert, namely, claims for malicious prosecution or defamation. See *Imbler, supra,* at 441–442 (White, J., concurring in judgment); *Kalina, supra*, at 124, n. 11 (noting that cases "decided after 1871 . . . granted a broader immunity to public prosecutors than had been available in malicious prosecution actions against private persons who brought prosecutions at early common law"); see also *Burns, supra*, at 505 (SCALIA, J., concurring in judgment in part and dissenting in part) (noting that the

"common-law tradition of prosecutorial immunity . . . developed much later than 1871").

This adaptation of prosecutorial immunity accommodated the special needs of public, as opposed to private, prosecutors. Because the daily function of a public prosecutor is to bring criminal charges, tort claims against public prosecutors "could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate." *Imbler*, 424 U. S., at 425. Such "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties," and would result in a severe interference with the administration of an important public office. *Id.*, at 423. Constant vulnerability to vexatious litigation would give rise to the "possibility that [the prosecutor] would shade his decisions instead of exercising the independence of judgment required by his public trust." *Ibid.*

Thus, when the issue of prosecutorial immunity under §1983 reached this Court in *Imbler*, the Court did not simply apply the scope of immunity recognized by common-law courts as of 1871 but instead placed substantial reliance on post-1871 cases extending broad immunity to public prosecutors sued for common-law torts.

While the Court has looked to the common law in determining the scope of the absolute immunity available under §1983, the Court has not suggested that §1983 is simply a federalized amalgamation of pre-existing common-law claims, an all-in-one federal claim encompassing the torts of assault, trespass, false arrest, defamation, malicious prosecution, and more. The new federal claim created by §1983 differs in important ways from those pre-existing torts. It is broader in that it reaches constitutional and statutory violations that do not correspond to any previously known tort. See *Kalina*, 522 U. S., at 123. But it is narrower in that it applies only to tortfeasors who

act under color of state law.  See *Briscoe*, *supra*, at 329. Section 1983 "ha[s] no precise counterpart in state law. . . . [I]t is the purest coincidence when state statutes or the common law provide for equivalent remedies; any analogies to those causes of action are bound to be imperfect." *Wilson* v. *Garcia*, 471 U. S. 261, 272 (1985) (internal quotation marks and citation omitted).  Thus, both the scope of the new tort and the scope of the absolute immunity available in §1983 actions differ in some respects from the common law.

### III
### A

At common law, trial witnesses enjoyed a limited form of absolute immunity for statements made in the course of a judicial proceeding: They had complete immunity against slander and libel claims, even if it was alleged that the statements in question were maliciously false.  *Kalina*, *supra,* at 133 (SCALIA, J., concurring) (citing F. Hilliard, Law of Torts 319 (1866)); see *Briscoe*, *supra*, at 351 (Marshall, J., dissenting); *Burns*, 500 U. S., at 501 (opinion of SCALIA, J.).

In *Briscoe*, however, this Court held that the immunity of a trial witness sued under §1983 is broader: In such a case, a trial witness has absolute immunity with respect to *any* claim based on the witness' testimony.  When a witness is sued because of his testimony, the Court wrote, "'the claims of the individual must yield to the dictates of public policy.'"  460 U. S., at 332–333 (quoting *Calkins* v. *Sumner*, 13 Wis. 193, 197 (1860)).  Without absolute immunity for witnesses, the Court concluded, the truth-seeking process at trial would be impaired.  Witnesses "might be reluctant to come forward to testify," and even if a witness took the stand, the witness "might be inclined to shade his testimony in favor of the potential plaintiff" for "fear of subsequent liability."  460 U. S., at 333.

The factors that justify absolute immunity for trial witnesses apply with equal force to grand jury witnesses. In both contexts, a witness' fear of retaliatory litigation may deprive the tribunal of critical evidence. And in neither context is the deterrent of potential civil liability needed to prevent perjurious testimony. In *Briscoe*, the Court concluded that the possibility of civil liability was not needed to deter false testimony at trial because other sanctions—chiefly prosecution for perjury—provided a sufficient deterrent. *Id.*, at 342. Since perjury before a grand jury, like perjury at trial, is a serious criminal offense, see, *e.g.*, 18 U. S. C. §1623(a), there is no reason to think that this deterrent is any less effective in preventing false grand jury testimony.

### B

Neither is there any reason to distinguish law enforcement witnesses from lay witnesses. In *Briscoe*, it was argued that absolute immunity was not needed for police-officer witnesses, but the Court refused to draw that distinction. The Court wrote:

> "When a police officer appears as a witness, he may reasonably be viewed as acting like any other witness sworn to tell the truth—in which event he can make a strong claim to witness immunity; alternatively, he may be regarded as an official performing a critical role in the judicial process, in which event he may seek the benefit afforded to other governmental participants in the same proceeding. Nothing in the language of the statute suggests that such a witness belongs in a narrow, special category lacking protection against damages suits." 460 U. S., at 335–336 (footnote omitted).

See also *id.*, at 342 ("A police officer on the witness stand performs the same functions as any other witness").

The *Briscoe* Court rebuffed two arguments for distinguishing between law enforcement witnesses and lay witnesses for immunity purposes: first, that absolute immunity is not needed for law enforcement witnesses because they are less likely to be intimidated by the threat of suit and, second, that such witnesses should not be shielded by absolute immunity because false testimony by a police officer is likely to be more damaging than false testimony by a lay witness. See *ibid.* The Court observed that there are other factors not applicable to lay witnesses that weigh in favor of extending absolute immunity to police officer witnesses.

First, police officers testify with some frequency. *Id.*, at 343. "Police officers testify in scores of cases every year," the Court noted, "and defendants often will transform resentment at being convicted into allegations of perjury by the State's official witnesses." *Ibid.* If police officer witnesses were routinely forced to defend against claims based on their testimony, their "'energy and attention would be diverted from the pressing duty of enforcing the criminal law.'" *Id.,* at 343–344 (quoting *Imbler*, 424 U. S., at 425).

Second, a police officer witness' potential liability, if conditioned on the exoneration of the accused, could influence decisions on appeal and collateral relief. 460 U. S., at 344. Needless to say, such decisions should not be influenced by the likelihood of a subsequent civil rights action. But the possibility that a decision favorable to the accused might subject a police officer witness to liability would create the "'risk of injecting extraneous concerns'" into appellate review and postconviction proceedings. *Ibid.* (quoting *Imbler*, *supra,* at 428, n. 27). In addition, law enforcement witnesses face the possibility of sanctions not applicable to lay witnesses, namely, loss of their jobs and other employment-related sanctions.

For these reasons, we conclude that grand jury wit-

nesses should enjoy the same immunity as witnesses at trial. This means that a grand jury witness has absolute immunity from any §1983 claim based on the witness' testimony. In addition, as the Court of Appeals held, this rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other §1983 claim concerning the initiation or maintenance of a prosecution. Were it otherwise, "a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." *Buckley* v. *Fitzsimmons*, 509 U. S. 259, 283 (1993) (KENNEDY, J., concurring in part and dissenting in part); see also *Dykes* v. *Hosemann*, 776 F. 2d 942, 946 (CA11 1985) *(per curiam)* ("[J]udges, on mere allegations of conspiracy or prior agreement, could be hauled into court and made to defend their judicial acts, the precise result judicial immunity was designed to avoid"). In the vast majority of cases involving a claim against a grand jury witness, the witness and the prosecutor conducting the investigation engage in preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony. We decline to endorse a rule of absolute immunity that is so easily frustrated.[1]

## IV
### A

Petitioner's main argument is that our cases, chiefly

---

[1] Of course, we do not suggest that absolute immunity extends to *all* activity that a witness conducts outside of the grand jury room. For example, we have accorded only qualified immunity to law enforcement officials who falsify affidavits, see *Kalina* v. *Fletcher*, 522 U. S. 118, 129–131 (1997); *Malley* v. *Briggs,* 475 U. S. 335, 340–345 (1986), and fabricate evidence concerning an unsolved crime, see *Buckley*, 509 U. S., at 272–276.

*Malley* and *Kalina*, already establish that a "complaining witness" is not shielded by absolute immunity. See Brief for Petitioner 17–22. In those cases, law enforcement officials who submitted affidavits in support of applications for arrest warrants were denied absolute immunity because they "performed the function of a complaining witness." *Kalina*, 522 U. S., at 131; see *Malley*, 475 U. S., at 340–341. Relying on these cases, petitioner contends that certain grand jury witnesses—namely, those who qualify as "complaining witnesses"—are not entitled to absolute immunity. Petitioner's argument is based on a fundamental misunderstanding of the distinctive function played by a "complaining witness" during the period when §1983's predecessor was enacted.

At that time, the term "complaining witness" was used to refer to a party who procured an arrest and initiated a criminal prosecution, see *Kalina*, 522 U. S., at 135 (SCALIA, J., concurring). A "complaining witness" might not actually ever testify, and thus the term "'witness' in 'complaining witness' is misleading." *Ibid.* See also *Malley*, *supra,* at 340 (complaining witness "procure[s] the issuance of an arrest warrant by submitting a complaint"); *Wyatt* v. *Cole*, 504 U. S. 158, 164–165 (1992) (complaining witness "set[s] the wheels of government in motion by instigating a legal action").

It is true that a mid-19th century complaining witness *might* testify, either before a grand jury or at trial. But testifying was not a necessary characteristic of a "complaining witness." See M. Newell, Malicious Prosecution 368 (1892). Nor have we been presented with evidence that witnesses who did no more than testify before a grand jury were regarded as complaining witnesses and were successfully sued for malicious prosecution. See Tr. of Oral Arg. 14–15, 24–25.

In sum, testifying, whether before a grand jury or at trial, was not the distinctive function performed by a

complaining witness. It is clear—and petitioner does not contend otherwise—that a complaining witness cannot be held liable for perjurious *trial* testimony. *Briscoe*, 460 U. S., at 326. And there is no more reason why a complaining witness should be subject to liability for testimony before a grand jury.

Once the distinctive function performed by a "complaining witness" is understood, it is apparent that a law enforcement officer who testifies before a grand jury is not at all comparable to a "complaining witness." By testifying before a grand jury, a law enforcement officer does not perform the function of applying for an arrest warrant; nor does such an officer make the critical decision to initiate a prosecution. It is of course true that a detective or case agent who has performed or supervised most of the investigative work in a case may serve as an important witness in the grand jury proceeding and may very much want the grand jury to return an indictment. But such a witness, unlike a complaining witness at common law, does not make the decision to press criminal charges.

Instead, it is almost always a prosecutor who is responsible for the decision to present a case to a grand jury, and in many jurisdictions, even if an indictment is handed up, a prosecution cannot proceed unless the prosecutor signs the indictment.[2] It would thus be anomalous to permit a police officer who testifies before a grand jury to be sued

——————

[2] The federal courts have concluded uniformly that Rule 7(c) of the Federal Rules of Criminal Procedure, providing that an indictment "must be signed by an attorney for the government," precludes federal grand juries from issuing an indictment without the prosecutor's signature, signifying his or her approval. See 4 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §15.1(d) (3d ed. 2007) (hereinafter LaFave). However, in some jurisdictions, the grand jury may return an indictment and initiate a prosecution without the prosecutor's signature, but such cases are rare. See 1 S. Beale, W. Bryson, J. Felman, & M. Elston, Grand Jury Law and Practice, p. 4–76, and n. 2 (2d ed. 2001).

for maliciously procuring an unjust prosecution when it is the prosecutor, who is shielded by absolute immunity, who is actually responsible for the decision to prosecute. See *Albright* v. *Oliver*, 510 U. S. 266, 279, n. 5 (1994) (GINSBURG, J., concurring) (the prosecutor is the "principal player in carrying out a prosecution"); see *ibid.* ("[T]he star player is exonerated, but the supporting actor is not").[3]

Precisely because no grand jury witness has the power to initiate a prosecution, petitioner is unable to provide a workable standard for determining whether a particular grand jury witness is a "complaining witness." Here, respondent was the only witness to testify in two of the three grand jury sessions that resulted in indictments. But where multiple witnesses testify before a grand jury, identifying the "complaining witness" would often be difficult. Petitioner suggests that a "complaining witness"

––––––––––

[3] Petitioner says there is no reason to distinguish between a person who goes to the police to swear out a criminal complaint and a person who testifies to facts before a grand jury for the same purpose and with the same effect. Brief for Petitioner 2, 23. But this is like saying that a bicycle and an F-16 are the same thing. Even if the functions are similar as a general matter, the entities are quite different. Grand juries, by tradition, statute, and sometimes constitutional mandate, have a status and entitlement to information that absolute immunity furthers. See, *e.g.*, *Imbler* v. *Pachtman,* 424 U. S. 409, 423, n. 20 (1976) ("It is the functional comparability of their judgments to those of the judge that has resulted in both grand jurors and prosecutors being referred to as 'quasi-judicial' officers, and their immunities being termed 'quasi-judicial' as well"); see also *United States* v. *Sells Engineering, Inc.*, 463 U. S. 418, 423 (1983) ("The grand jury has always occupied a high place as an instrument of justice in our system of criminal law—so much so that it is enshrined in the Constitution"). Our holding today supports the functioning of the grand jury system. The importance of the grand jury cannot be underestimated: In the federal system and many States, see LaFave §15.1(d), a felony cannot be charged without the consent of community representatives, a vital protection from unwarranted prosecutions.

is "someone who sets the prosecution in motion." Tr. of Oral Arg. 8; see Reply Brief for Petitioner 15. And petitioner maintains that the same distinction made at common law between complaining witnesses and other witnesses applies in §1983 actions. See *id.,* at 14–16. But, as we have explained, a complaining witness played a distinctive role, and therefore even when a "complaining witness" testified, there was a clear basis for distinguishing between the "complaining witness" and other witnesses. Because no modern grand jury witness plays a comparable role, petitioner's proposed test would be of little use. Consider a case in which the case agent or lead detective testifies before the grand jury and provides a wealth of background information and then a cooperating witness appears and furnishes critical incriminating testimony. Or suppose that two witnesses each provide essential testimony regarding different counts of an indictment or different elements of an offense. In these cases, which witnesses would be "complaining witnesses" and thus vulnerable to suit based on their testimony?

## B

Petitioner contends that the deterrent effect of civil liability is more needed in the grand jury context because trial witnesses are exposed to cross-examination, which is designed to expose perjury. See Brief for Petitioner 21, 25–26. This argument overlooks the fact that a critical grand jury witness is likely to testify again at trial and may be cross-examined at that time. But in any event, the force of petitioner's argument is more than offset by a special problem that would be created by allowing civil actions against grand jury witnesses—subversion of grand jury secrecy.

"'We consistently have recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings.'" *United States* v. *Sells Engi-*

*neering, Inc.*, 463 U. S. 418, 424 (1983) (quoting *Douglas Oil Co.* v. *Petrol Stops Northwest*, 441 U. S. 211, 218–219 (1979)). "'[I]f preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution.'" 463 U. S., at 424.

Allowing §1983 actions against grand jury witnesses would compromise this vital secrecy. If the testimony of witnesses before a grand jury could provide the basis for, or could be used as evidence supporting, a §1983 claim, the identities of grand jury witnesses could be discovered by filing a §1983 action and moving for the disclosure of the transcript of grand jury proceedings. Especially in cases involving violent criminal organizations or other subjects who might retaliate against adverse grand jury witnesses, the threat of such disclosure might seriously undermine the grand jury process.

## C

Finally, contrary to petitioner's suggestion, recognizing absolute immunity for grand jury witnesses does not create an insupportable distinction between States that use grand juries and those that do not. Petitioner argues that it would make no sense to distinguish for purposes of §1983 immunity between prosecutions initiated by the return of a grand jury indictment and those initiated by the filing of a complaint or information, and he notes that 26 States permit felony prosecutions to be brought by information. Brief for Petitioner 23–24. But petitioner draws the wrong analogy. In States that permit felony prosecutions to be initiated by information, the closest analog to a grand jury witness is a witness at a preliminary hearing. Most of the States that do not require an

indictment for felonies provide a preliminary hearing at which witnesses testify. See LaFave §14.2(d), at 304, and n. 47, 307, and n. 60. The lower courts have held that witnesses at a preliminary hearing are protected by the same immunity accorded grand jury witnesses, see, *e.g.*, *Brice* v. *Nkaru*, 220 F. 3d 233, 239, n. 6 (CA4 2000); *Curtis* v. *Bembenek*, 48 F. 3d 281, 284–285 (CA7 1995) (citing cases), and petitioner does not argue otherwise, see Tr. of Oral Arg. 51.

\* \* \*

For these reasons, we hold that a grand jury witness is entitled to the same immunity as a trial witness. Accordingly, the judgment of the Court of Appeals for the Eleventh Circuit is

*Affirmed.*